(Slip Opinion)          OCTOBER  TERM,  2009          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LEWIS ET AL. *v.* CITY OF CHICAGO, ILLINOIS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 08–974.   Argued February 22, 2010—Decided May 24, 2010

In 1995, respondent the City of Chicago gave a written examination to applicants seeking firefighter positions.  In January 1996, the City announced it would draw candidates randomly from a list of applicants who scored at least 89 out of 100 points on the examination, whom it designated as "well qualified."  It informed those who scored below 65 that they had failed and would not be considered further.  It informed applicants who scored between 65 and 88, whom it designated as "qualified," that it was unlikely they would be called for further processing but that the City would keep them on the eligibility list for as long as that list was used.  That May, the City selected its first class of applicants to advance, and it repeated this process multiple times over the next six years.  Beginning in March 1997, several African-American applicants who scored in the "qualified" range but had not been hired filed discrimination charges with the Equal Employment Opportunity Commission (EEOC) and received right-to-sue letters.  They then filed suit, alleging (as relevant here) that the City's practice of selecting only applicants who scored 89 or above had a disparate impact on African-Americans in violation of Title VII of the Civil Rights Act of 1964, see 42 U. S. C. §2000e–2(k)(1)(A)(i). The District Court certified a class—petitioners here—of African-Americans who scored in the "qualified" range but were not hired. The court denied the City's summary judgment motion, rejecting its claim that petitioners had failed to file EEOC charges within 300 days "after the unlawful employment practice occurred," §2000e–5(e)(1), and finding instead that the City's "ongoing reliance" on the 1995 test results constituted a continuing Title VII violation.  The litigation then proceeded, and petitioners prevailed on the merits. The Seventh Circuit reversed the judgment in their favor, holding

that the suit was untimely because the earliest EEOC charge was filed more than 300 days after the only discriminatory act—sorting the scores into the "well qualified," "qualified," and "not qualified" categories. The later hiring decisions, the Seventh Circuit held, were an automatic consequence of the test scores, not new discriminatory acts.

*Held:* A plaintiff who does not file a timely charge challenging the *adoption* of a practice may assert a disparate-impact claim in a timely charge challenging the employer's later *application* of that practice as long as he alleges each of the elements of a disparate-impact claim. Pp. 4–11.

(a) Determining whether petitioners' charges were timely requires "identify[ing] precisely the 'unlawful employment practice' of which" they complain. *Delaware State College* v. *Ricks*, 449 U. S. 250, 257. With the exception of the first selection round, all agree that the challenged practice here—the City's selection of firefighter hires on the basis announced in 1996—occurred within the charging period. Thus, the question is not whether a claim predicated on that conduct is *timely*, but whether the practice thus defined can be the basis for a disparate-impact claim *at all*. It can. A Title VII plaintiff establishes a prima facie claim by showing that the employer "uses a particular employment practice that causes a disparate impact" on one of the prohibited bases. §2000e–2(k). The term "employment practice" clearly encompasses the conduct at issue: exclusion of passing applicants who scored below 89 when selecting those who would advance. The City "use[d]" that practice each time it filled a new class of firefighters, and petitioners allege that doing so caused a disparate impact. It is irrelevant that subsection (k) does not address "accrual" of disparate-impact claims, since the issue here is not when the claims accrued but whether the claims stated a violation. They did. Whether petitioners proved a violation is not before the Court. Pp. 4–7.

(b) The City argues that the only actionable discrimination occurred in 1996 when it used the test results to create the hiring list, which it concedes was unlawful. It may be true that the City's adoption in 1996 of the cutoff score gave rise to a freestanding disparate-impact claim. If so, because no timely charge was filed, the City is now "entitled to treat that past act as lawful," *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553, 558. But it does not follow that no new violation occurred—and no new claims could arise—when the City later implemented the 1996 decision. *Evans* and later cases the City cites establish only that a Title VII plaintiff must show a "present violation" within the limitations period. For disparate-treatment claims— which require discriminatory intent—the plaintiff must demonstrate

Syllabus

deliberate discrimination within the limitations period. But no such demonstration is needed for claims, such as this one, that do not require discriminatory intent. Cf., *e.g., Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618, 640. Contrary to the Seventh Circuit's reasoning, even if both types of claims take aim at prohibited discrimination, it does not follow that their reach is coextensive. Pp. 7–10.

(c) The City and its *amici* warn that this reading will result in a host of practical problems for employers and employees alike. The Court, however, must give effect to the law Congress enacted, not assess the consequences of each approach and adopt the one that produces the least mischief. Pp. 10–11.

(d) It is left to the Seventh Circuit to determine whether the judgment must be modified to the extent that the District Court awarded relief based on the first round of hiring, which occurred outside the charging period even for the earliest EEOC charge. P. 11.

528 F. 3d 488, reversed and remanded.

SCALIA, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–974

ARTHUR L. LEWIS, JR., ET AL., PETITIONERS *v.* CITY OF CHICAGO, ILLINOIS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 24, 2010]

JUSTICE SCALIA delivered the opinion of the Court.

Title VII of the Civil Rights Act of 1964 prohibits employers from using employment practices that cause a disparate impact on the basis of race (among other bases). 42 U. S. C. §2000e–2(k)(1)(A)(i). It also requires plaintiffs, before beginning a federal lawsuit, to file a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC). §2000e–5(e)(1). We consider whether a plaintiff who does not file a timely charge challenging the *adoption* of a practice—here, an employer's decision to exclude employment applicants who did not achieve a certain score on an examination—may assert a disparate-impact claim in a timely charge challenging the employer's later *application* of that practice.

## I

In July 1995, the City of Chicago administered a written examination to over 26,000 applicants seeking to serve in the Chicago Fire Department. After scoring the examinations, the City reported the results. It announced in a January 26, 1996, press release that it would begin drawing randomly from the top tier of scorers, *i.e.*, those who

scored 89 or above (out of 100), whom the City called "well qualified." Those drawn from this group would proceed to the next phase—a physical-abilities test, background check, medical examination, and drug test—and if they cleared those hurdles would be hired as candidate fire-fighters. Those who scored below 65, on the other hand, learned by letters sent the same day that they had failed the test. Each was told he had not achieved a passing score, would no longer be considered for a firefighter position, and would not be contacted again about the examination.

The applicants in-between—those who scored between 65 and 88, whom the City called "qualified"[1]—were notified that they had passed the examination but that, based on the City's projected hiring needs and the number of "well-qualified" applicants, it was not likely they would be called for further processing. The individual notices added, however, that because it was not possible to predict how many applicants would be hired in the next few years, each "qualified" applicant's name would be kept on the eligibility list maintained by the Department of Personnel for as long as that list was used. Eleven days later, the City officially adopted an "Eligible List" reflecting the breakdown described above.

On May 16, 1996, the City selected its first class of applicants to advance to the next stage. It selected a second on October 1, 1996, and repeated the process nine more times over the next six years. As it had announced, in each round the City drew randomly from among those who scored in the "well-qualified" range on the 1995 test. In the last round it exhausted that pool, so it filled the

_____

[1] Certain paramedics who scored between 65 and 88 were deemed "well qualified" pursuant to a collective-bargaining agreement, and certain veterans in the "qualified" range had 5 points added to their scores and therefore became "well qualified."

remaining slots with "qualified" candidates instead.

On March 31, 1997, Crawford M. Smith, an African-American applicant who scored in the "qualified" range and had not been hired as a candidate firefighter, filed a charge of discrimination with the EEOC. Five others followed suit, and on July 28, 1998, the EEOC issued all six of them right-to-sue letters. Two months later, they filed this civil action against the City, alleging (as relevant here) that its practice of selecting for advancement only applicants who scored 89 or above caused a disparate impact on African-Americans in violation of Title VII. The District Court certified a class—petitioners here—consisting of the more than 6,000 African-Americans who scored in the "qualified" range on the 1995 examination but had not been hired.[2]

The City sought summary judgment on the ground that petitioners had failed to file EEOC charges within 300 days after their claims accrued. See §2000e–5(e)(1). The District Court denied the motion, concluding that the City's "ongoing reliance" on the 1995 test results constituted a "continuing violation" of Title VII. App. to Pet. for Cert. 45a. The City stipulated that the 89-point cutoff had a "severe disparate impact against African Americans," Final Pretrial Order, Record, Doc. 223, Schedule A, p. 2, but argued that its cutoff score was justified by business necessity. After an 8-day bench trial, the District Court ruled for petitioners, rejecting the City's business-necessity defense. It ordered the City to hire 132 randomly selected members of the class (reflecting the number of African-Americans the Court found would have been hired but for the City's practices) and awarded backpay to be divided among the remaining class members.

The Seventh Circuit reversed. 528 F. 3d 488 (2008). It

——————

[2] In addition to the class members, the African American Fire Fighters League of Chicago, Inc., also joined the suit as a plaintiff.

held that petitioners' suit was untimely because the earli-
est EEOC charge was filed more than 300 days after the
only discriminatory act: sorting the scores into the "well-
qualified," "qualified," and "not-qualified" categories. The
hiring decisions down the line were immaterial, it rea-
soned, because "[t]he hiring only of applicants classified
'well qualified' was the automatic consequence of the test
scores rather than the product of a fresh act of discrimina-
tion." *Id.*, at 491. We granted certiorari. 557 U. S. __
(2009).

## II
## A

Before beginning a Title VII suit, a plaintiff must first
file a timely EEOC charge. In this case, petitioners'
charges were due within 300 days "after the alleged
unlawful employment practice occurred." §2000e–5(e)(1).[3]
Determining whether a plaintiff's charge is timely thus
requires "identify[ing] precisely the 'unlawful employment
practice' of which he complains." *Delaware State College*
v. *Ricks*, 449 U. S. 250, 257 (1980). Petitioners here chal-
lenge the City's practice of picking only those who had
scored 89 or above on the 1995 examination when it later
chose applicants to advance. Setting aside the first round
of selection in May 1996, which all agree is beyond the cut-
off, no one disputes that the conduct petitioners challenge
occurred within the charging period.[4] The real question,

---

[3] All agree that a 300-day deadline applies to petitioners' charges
pursuant to 29 CFR §§1601.13(a)(4), (b)(1), 1601.80 (2009). Cf. *EEOC*
v. *Commercial Office Products Co.*, 486 U. S. 107, 112, 114–122 (1988).

[4] Because the District Court certified petitioners as a class, and be-
cause a court may award class-wide relief even to unnamed class
members who have not filed EEOC charges, see *Franks* v. *Bowman
Transp. Co.*, 424 U. S. 747, 771 (1976), petitioners assert and the City
does not dispute that the date of the earliest EEOC charge filed by a
named plaintiff—that filed by Smith on March 31, 1997—controls the
timeliness of the class's claims. We assume without deciding that this

then, is not whether a claim predicated on that conduct is *timely*, but whether the practice thus defined can be the basis for a disparate-impact claim *at all*.

We conclude that it can. As originally enacted, Title VII did not expressly prohibit employment practices that cause a disparate impact. That enactment made it an "unlawful employment practice" for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," §2000e–2(a)(1), or "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of" any of the same reasons, §2000e–2(a)(2). In *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431 (1971), we interpreted the latter provision to "proscrib[e] not only overt discrimination but also practices that are fair in form, but discriminatory in operation."

Two decades later, Congress codified the requirements of the "disparate impact" claims *Griggs* had recognized. Pub. L. 102–166, §105, 105 Stat. 1074, 42 U. S. C. §2000e–2(k). That provision states:

> "(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if—
>
> > "(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question

——————

is correct.

and consistent with business necessity . . . ."

Thus, a plaintiff establishes a prima facie disparate-impact claim by showing that the employer "*uses* a particular employment practice that causes a disparate impact" on one of the prohibited bases. *Ibid.* (emphasis added). See *Ricci* v. *DeStefano*, 557 U. S. ___, ___ (2009) (slip op., at 18).

Petitioners' claim satisfies that requirement. Title VII does not define "employment practice," but we think it clear that the term encompasses the conduct of which petitioners complain: the exclusion of passing applicants who scored below 89 (until the supply of scores 89 or above was exhausted) when selecting those who would advance. The City "use[d]" that practice in each round of selection. Although the City had adopted the eligibility list (embodying the score cutoffs) earlier and announced its intention to draw from that list, it made use of the practice of excluding those who scored 88 or below each time it filled a new class of firefighters. Petitioners alleged that this exclusion caused a disparate impact. Whether they adequately proved that is not before us. What matters is that their allegations, based on the City's actual implementation of its policy, stated a cognizable claim.

The City argues that subsection (k) is inapposite because it does not address "accrual" of disparate-impact claims. Section 2000e–5(e)(1), it says, specifies when the time to file a charge starts running. That is true but irrelevant. Aside from the first round of selection in May 1996 (which all agree is beyond the 300-day charging period), the acts petitioners challenge—the City's use of its cutoff score in selecting candidates—occurred within the charging period. Accordingly, no one disputes that if petitioners could bring new claims based on those acts, their claims were timely. The issue, in other words, is not *when* petitioners' claims accrued, but *whether* they could

accrue at all.

The City responds that subsection (k) does not answer *that* question either; that it speaks, as its title indicates, only to the plaintiff's "[b]urden of proof in disparate impact cases," not to the elements of disparate-impact claims, which the City says are be found in §2000e–2(a)(2). That is incorrect. Subsection (k) does indeed address the burden of proof—not just who bears it, however, but also what it consists of. It *does* set forth the essential ingredients of a disparate-impact claim: It says that a claim "is established" if an employer "uses" an "employment practice" that "causes a disparate impact" on one of the enumerated bases. §2000e–2(k)(1)(A)(i). That it also sets forth a business-necessity defense employers may raise, §2000e–2(k)(1)(A)(i), and explains how plaintiffs may prevail despite that defense, §2000e–2(k)(1)(A)(ii), is irrelevant. Unless and until the defendant pleads and proves a business-necessity defense, the plaintiff wins simply by showing the stated elements.

B

Notwithstanding the text of §2000e–2(k)(1)(A)(i) and petitioners' description of the practice they claim was unlawful, the City argues that the unlawful employment practice here was something else entirely. The only actionable discrimination, it argues, occurred in 1996 when it "used the examination results to create the hiring eligibility list, limited hiring to the 'well qualified' classification, and notified petitioners." Brief for Respondent 23. That initial decision, it concedes, was unlawful. But because no timely charge challenged the decision, that cannot now be the basis for liability. And because, the City claims, the exclusion of petitioners when selecting classes of firefighters followed inevitably from the earlier decision to adopt the cutoff score, no new violations could have occurred. The Seventh Circuit adopted the same analysis.

See 528 F. 3d, at 490–491.

The City's premise is sound, but its conclusion does not follow. It may be true that the City's January 1996 decision to adopt the cutoff score (and to create a list of the applicants above it) gave rise to a freestanding disparate-impact claim. Cf. *Connecticut* v. *Teal*, 457 U. S. 440, 445–451 (1982). If that is so, the City is correct that since no timely charge was filed attacking it, the City is now "entitled to treat that past act as lawful." *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553, 558 (1977). But it does not follow that no new violation occurred—and no new claims could arise—when the City implemented that decision down the road. If petitioners could prove that the City "use[d]" the "practice" that "causes a disparate impact," they could prevail.

The City, like the Seventh Circuit, see 528 F. 3d, at 490–491, insists that *Evans* and a line of cases following it require a different result. See also *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618 (2007); *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900 (1989); *Ricks*, 449 U. S. 250. Those cases, we are told, stand for the proposition that present effects of prior actions cannot lead to Title VII liability.

We disagree. As relevant here, those cases establish only that a Title VII plaintiff must show a "present violation" within the limitations period. *Evans*, *supra*, at 558 (emphasis deleted). What that requires depends on the claim asserted. For disparate-treatment claims—and others for which discriminatory intent is required—that means the plaintiff must demonstrate deliberate discrimination within the limitations period. See *Ledbetter*, *supra*, at 624–629; *Lorance*, *supra*, at 904–905; *Ricks*, *supra*, at 256–258; *Evans*, *supra*, at 557–560; see also *Chardon* v. *Fernandez*, 454 U. S. 6, 8 (1981) *(per curiam)*. But for claims that do not require discriminatory intent, no such demonstration is needed. Cf. *Ledbetter*, *supra*, at 640;

*Lorance*, *supra*, at 904, 908–909. Our opinions, it is true, described the harms of which the unsuccessful plaintiffs in those cases complained as "present effect[s]" of past discrimination. *Ledbetter*, *supra*, at 628; see also *Lorance*, *supra*, at 907; *Chardon*, *supra*, at 8; *Ricks*, *supra*, at 258; *Evans*, *supra*, at 558. But the reason they could not be the present effects of present discrimination was that the charged discrimination required proof of discriminatory intent, which had not even been alleged. That reasoning has no application when, as here, the charge is disparate impact, which does not require discriminatory intent.

The Seventh Circuit resisted this conclusion, reasoning that the difference between disparate-treatment and disparate-impact claims is only superficial. Both take aim at the same evil—discrimination on a prohibited basis— but simply seek to establish it by different means. 528 F. 3d, at 491–492. Disparate-impact liability, the Court of Appeals explained, "'is primarily intended to lighten the plaintiff's heavy burden of proving intentional discrimination after employers learned to cover their tracks.'" *Id.*, at 492 (quoting *Finnegan* v. *Trans World Airlines, Inc.*, 967 F. 2d 1161, 1164 (CA7 1992)). But even if the two theories were directed at the same evil, it would not follow that their reach is therefore coextensive. If the effect of applying Title VII's text is that some claims that would be doomed under one theory will survive under the other, that is the product of the law Congress has written. It is not for us to rewrite the statute so that it covers only what we think is necessary to achieve what we think Congress really intended. See *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79–80 (1998).

The City also argues that, even if petitioners could have proved a present disparate-impact violation, they never did so under the proper test. The parties litigated the merits—and the City stipulated that the cutoff score caused disparate impact—after the District Court adopted

petitioners' "continuing violation" theory.  App. to Pet. for
Cert. 45a.    That theory, which petitioners have since
abandoned, treated the adoption and application of the
cutoff score as a single, ongoing wrong.  As a result, the
City says, "petitioners never proved, or even attempted to
prove, that *use* of the [eligibility] list had disparate im-
pact," Brief for Respondent 32 (emphasis added), since the
theory they advanced did not require them to do so.  If the
Court of Appeals determines that the argument has been
preserved it may be available on remand.  But it has no
bearing here.    The only question presented to us is
whether the claim petitioners brought is cognizable.
Because we conclude that it is, our inquiry is at an end.

C

The City and its *amici* warn that our reading will result
in a host of practical problems for employers and employ-
ees alike.  Employers may face new disparate-impact suits
for practices they have used regularly for years.  Evidence
essential to their business-necessity defenses might be
unavailable (or in the case of witnesses' memories, unreli-
able) by the time the later suits are brought.  And affected
employees and prospective employees may not even know
they have claims if they are unaware the employer is still
applying the disputed practice.

Truth to tell, however, both readings of the statute
produce puzzling results.  Under the City's reading, if an
employer adopts an unlawful practice and no timely
charge is brought, it can continue using the practice in-
definitely, with impunity, despite ongoing disparate im-
pact.    Equitable tolling or estoppel may allow some af-
fected employees or applicants to sue, but many others
will be left out in the cold.  Moreover, the City's reading
may induce plaintiffs aware of the danger of delay to file
charges upon the announcement of a hiring practice,
before they have any basis for believing it will produce a

disparate impact.

In all events, it is not our task to assess the consequences of each approach and adopt the one that produces the least mischief. Our charge is to give effect to the law Congress enacted. By enacting §2000e–2(k)(1)(A)(i), Congress allowed claims to be brought against an employer who uses a practice that causes disparate impact, whatever the employer's motives and whether or not he has employed the same practice in the past. If that effect was unintended, it is a problem for Congress, not one that federal courts can fix.

## III

The City asserts that one aspect of the District Court's judgment still must be changed. The first round of hiring firefighters occurred outside the charging period even for the earliest EEOC charge. Yet the District Court, applying the continuing-violation theory, awarded relief based on those acts. Petitioners do not disagree, and they do not oppose the City's request for a remand to resolve this issue. We therefore leave it to the Seventh Circuit to determine, to the extent that point was properly preserved, whether the judgment must be modified in light of our decision.

\* \* \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*