STEPHEN A. HIGGINSON, Circuit Judge:
On November 2, 2012, an underwater sonar device struck the mooring line of an offshore drilling rig in the Gulf of Mexico, causing substantial damage. Tesla Offshore, LLC was using the sonar device, known as a towfish, to survey the ocean floor. Tesla had chartered a vessel from International Offshore Services, LLC to pull the towfish.
Shell Offshore, Inc., the owner of the drilling rig, sued Tesla and International for damages arising out of the accident.[1] After a trial on the merits, the jury returned a verdict in favor of Shell and apportioned 75% of the liability to Tesla and 25% to International. International and Tesla each appealed (No. 16-30528). While the appeal was pending, Tesla and Shell entered into a settlement agreement, and Shell executed a full satisfaction of judgment. After a limited remand from this court, the district court found that Tesla was entitled to contribution from *919 International toward the settlement amount. Another appeal followed (No. 17-30338).
Tesla and International are the sole remaining parties in this litigation, and we have consolidated their pending appeals. International disputes the district court's legal conclusion that its vessel was a towing vessel and subject to towing regulations. Tesla challenges the jury's allocation of fault and the district court's calculation of the contribution owed by International. We affirm on all issues.
I.
At the time of the accident, Tesla was undertaking a "high-resolution deeptow archaeological survey" of part of the Outer Continental Shelf in the Gulf of Mexico. Tesla hired two vessels to assist with the survey. International's vessel, the M/V INTERNATIONAL THUNDER, was the "mother ship" that pulled the sonar towfish. Another vessel served as the "chase vessel" and helped track the towfish. The captain of the THUNDER was employed by International. The charter agreement between International and Tesla stated that Tesla would provide "towing and anchor handling gear," and would procure insurance for "each tow to be towed under" the agreement.
A team of five Tesla employees worked aboard the THUNDER. Tesla installed surveying equipment on the vessel, including a survey shack, electronics to monitor the towfish and receive data, a winch with 25,000 feet of cable, and the towfish itself. The towfish was about seven and a half feet long and resembled a torpedo. It is undisputed that Tesla personnel controlled the survey, including when to place the towfish in the water and how much cable to let out. Tesla also told the captain of the THUNDER what course to take within the survey grid.
On November 2, 2012, the THUNDER was pulling the towfish at the end of 14,000 feet of cable. The THUNDER approached the DEEPWATER NAUTILUS, a mobile offshore drilling rig owned by Shell. The rig was anchored by multiple submerged mooring lines. In February 2012, Shell had shared information about the NAUTILUS's position and mooring pattern with Tesla. Tesla did not provide this information to the captain of the THUNDER. According to Tesla, Shell informed it that the NAUTILUS would be operating in the area only until August 2012 and Tesla did not believe the information was relevant in October and November of 2012.
It is undisputed that, on the day of the allision, the crew of the THUNDER was unaware of the layout of the rig's mooring lines. Neither the THUNDER nor the NAUTILUS made radio contact with each other. But the captain of the chase vessel, the LADY JOANNA, testified that his vessel contacted the captain of the THUNDER to warn him that he was getting too close to the rig. Shortly afterward, the towfish hit one of the NAUTILUS's mooring lines. According to Shell, the allision caused the mooring line to lose all tension and forced the NAUTILUS to temporarily suspend drilling operations.
The district court held a jury trial on Shell's claims against Tesla and International. The jury awarded Shell over $9 million in damages and determined that Tesla was 75% at fault and International was 25% at fault. The jury also found that the negligent acts or omissions of the THUNDER's crew were within the privity or knowledge of International. The district court entered final judgment holding Tesla and International jointly and severally liable for the full amount of judgment. Consistent with the jury verdict, the district court denied International's limitation of *920 liability defense. The district court also denied Tesla's post-trial motion for judgment as a matter of law, a new trial, and to alter or amend judgment.
II.
International challenges the district court's determination that the THUNDER was a "towing vessel" under 46 U.S.C. § 2101. The master of a towing vessel of 26 feet or more in length is required to hold a towing license. See 46 U.S.C. § 8904(a) ; 46 CFR §§ 15.805(a)(5), 15.910. It is undisputed that the captain of the THUNDER did not hold the relevant towing credential. International argued pre-trial that this credential was not required because the THUNDER was not a towing vessel as a matter of law. The district court denied International's motion for partial summary judgment on this issue. At trial, the court instructed the jury that the THUNDER was a towing vessel and that its captain did not have the requisite towing certification.
International maintains that this instruction was erroneous and argues that the instruction led the jury to reject its limitation of liability defense. Under the Limitation of Liability Act, a vessel owner is entitled to limit its liability only if the owner lacked "privity or knowledge" of the negligent acts or other fault that caused the damage. 46 U.S.C. § 30505 ; see also In re OmegaProtein, Inc. , 548 F.3d 361, 371 (5th Cir. 2008). International contends that the finding of privity or knowledge was likely based on the jury's belief that the captain of the THUNDER was improperly licensed. Jury "[i]nstructions that hinge on a question of statutory construction are reviewed de novo." Janvey v. Dillon Gage, Inc. of Dall. , 856 F.3d 377, 388 (5th Cir. 2017). We will reverse a jury verdict if "the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations and the challenged instruction affected the outcome of the case." Jowers v. Lincoln Elec. Co. , 617 F.3d 346, 352 (5th Cir. 2010) (internal citation omitted).
We invited the views of the U.S. Solicitor General on whether applicable laws and regulations at the time of the allision required the master of the THUNDER to have a towing license. The Government filed an amicus brief supporting the district court's legal conclusion that the THUNDER was a towing vessel whose captain was required to hold a towing license.
The U.S. Code defines a "towing vessel" as "a commercial vessel engaged in or intending to engage in the service of pulling, pushing, or hauling along side, or any combination of pulling, pushing, or hauling along side." 46 U.S.C. § 2101(50).[2] International does not seriously dispute that the THUNDER qualifies as a towing vessel under the plain language of the statute.[3] The THUNDER is a commercial *921 vessel and it was hired by Tesla to pull the towfish. International contends, however, that the court must look beyond the statutory text to avoid absurd results. Specifically, International argues that a literal reading of the statute would transform any commercial vessel that pushes, pulls, or hauls anything into a towing vessel, including fishing boats as soon as someone hooks a fish.
But the statutory definition does not encompass any vessel that pushes, pulls, or hauls. Rather, it is limited to commercial vessels engaged "in the service of pulling, pushing, or hauling along side." 46 U.S.C. § 2101(50) (emphasis added). This provision defines a towing vessel in terms of the service it provides. We interpret this language to exclude vessels that engage in some incidental pulling, pushing, or hauling activities as part of a distinct commercial endeavor. A fishing vessel that pulls nets or cages in furtherance of its fishing activities would not qualify as a towing vessel because it is in the business of fishing, not "in the service of pulling." See Mount v. Keahole Point Fish, LLC , 147 F.Supp.3d 1116, 1120-21 (D. Haw. 2015).
This is consistent with our familiar approach to determining what floating objects qualify as vessels. Like a towing vessel, a "vessel" is defined by its function. It must be "used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. But a vessel's transportation function must be more than incidental to its primary purpose. See Lozman v. City of Riviera Beach , 568 U.S. 115, 121, 133 S.Ct. 735, 184 L.Ed.2d 604 (2013) (distinguishing between a vessel "designed to a practical degree for carrying people or things over water" and a floating structure capable of "incidentally carrying" items while under tow); Manuel v. P.A.W. Drilling & Well Service, Inc. , 135 F.3d 344, 351 (5th Cir. 1998) (examining whether the transportation function of a craft was more than "merely incidental to its primary purpose of serving as a work platform"). By International's own account, the service provided by the THUNDER was to pull the towfish as directed by Tesla. Tesla was responsible for all technical aspects of the survey itself. The THUNDER was therefore "in the service of pulling," and qualified as a towing vessel under the statute. 46 U.S.C. § 2101(50).
International argues that this result is illogical because sonar surveying is very different from traditional towing and, as the jury heard, existing towing regulations and licensing training programs do not address the towing of submerged objects like the towfish. We will avoid interpreting a statute to produce absurd results "if alternative interpretations consistent with legislative purpose are available." Griffin v. Oceanic Contractors, Inc. , 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). But our holding here produces no absurd results. As outlined above, the statutory definition of towing vessel is limited to vessels that engage in pulling, pushing, or hauling as a commercial service. Even if current towing industry practices are a poor fit for sonar surveying, applying towing regulations to the commercial towing of submerged objects is not "so bizarre that Congress 'could not have intended' it." Demarest v. Manspeaker , 498 U.S. 184, 191, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991) (quoting Griffin , 458 U.S. at 575, 102 S.Ct. 3245 ). Although International has described policy concerns, "it is not our task to assess the consequences of each approach and adopt the one that produces the least mischief."
*922 Lewis v. City of Chicago, 560 U.S. 205, 217, 130 S.Ct. 2191, 176 L.Ed.2d 967 (2010). We must "give effect to the law Congress enacted." Id.
Moreover, we perceive no acceptable alternative offered by International's interpretation of the statute. International contends that the category of towing vessels should be limited to "traditional" towing activities, and specifically to one vessel helping another vessel make a voyage. This argument has no basis in the statutory text, and we find little support for such a restrictive definition of towing. Current Coast Guard regulations define a tow as "the barge(s), vessel(s), or object(s) being pulled, pushed, or hauled alongside a towing vessel." 46 C.F.R. § 136.110. This definition expressly contemplates that a towing vessel may tow objects other than vessels.[4] The Supreme Court has similarly explained that a structure can "mov[e] under tow" without qualifying as a vessel. Lozman , 568 U.S. at 121-22, 133 S.Ct. 735 ; see also Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co. , 271 U.S. 19, 20-22, 46 S.Ct. 379, 70 L.Ed. 805 (1926) (holding that a wharfboat towed each year to a winter location was not a vessel). As the Government notes in its brief, accepting the definition proposed by International would permit the transportation of large and potentially dangerous objects without a towing license.
International's reliance on Sacramento Navigation Co. v. Salz , 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663 (1927), is unavailing. In Salz , the Supreme Court considered whether a contract for the shipment of goods became a towage contract simply because the goods were placed on a barge towed by a steamer. Id. at 328, 47 S.Ct. 368. The shipping company owned both the barge and the steamer. Id. at 327, 47 S.Ct. 368. The Court reasoned that "the contract actually made with respondent was not to tow a vessel, but to transport goods, and plainly that contract was a contract of affreightment." Id. at 328, 47 S.Ct. 368. Although Salz refers to towage as "the employment of one vessel to expedite the voyage of another," the Court did not address whether pulling non-vessel objects through water would also constitute towing. Id. Our recent opinion in Continental Insurance Co. v. L & L Transportation, Inc. , 882 F.3d 566 (5th Cir. 2018), is similarly inapposite. On a question of contract interpretation, we held that one vessel was not the "tow" of another vessel because it did not receive any motive power and was not pushed or pulled in any way. Id. at 571-72. The towing of non-vessels was not at issue in that case. As noted above, the Supreme Court has recently made clear that non-vessels can be "towed." Lozman , 568 U.S. at 122, 133 S.Ct. 735.
Nor do we accept International's alternative position that towing involves assisting the voyage of a vessel or object from one point to another rather than pulling equipment around a work area. The statute does not limit where or when the "pushing, pulling, or hauling along side" can occur. And whether the towfish was placed in the water at port or at sea has no apparent bearing on what regulations should apply. Finally, it is not determinative that the THUNDER was documented as an offshore supply vessel rather than a towing vessel. A vessel can fall into more than one statutory category. See 46 U.S.C. § 3302(a)(1). Accordingly, the district court did not err in instructing the jury that the THUNDER was a towing *923 vessel and that its captain lacked a towing credential.
III.
In its cross-appeal, Tesla challenges the jury's allocation of fault and the district court's calculation of International's contribution liability.
A.
Tesla filed a post-trial motion for judgment as a matter of law arguing that the jury erred in not finding International at least 50% at fault for Shell's damages. The district court denied this motion. We review de novo the denial of a motion for judgment as a matter of law. E.E.O.C. v. Boh Bros. Constr. Co., LLC , 731 F.3d 444, 451 (5th Cir. 2013) (en banc). We are "especially deferential" to jury verdicts. Id. Judgment as a matter of law is appropriate only if "the facts and inferences point 'so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.' " Id. (quoting Baisden v. I'm Ready Prods., Inc. , 693 F.3d 491, 498 (5th Cir. 2012) ). We will not disturb a jury verdict so long as there is "substantial evidence, in the light most favorable to the successful party, to support the verdict." Am. Home Assurance Co. v. United Space All., LLC , 378 F.3d 482, 487 (5th Cir. 2004).
The jury's allocation of 75% fault to Tesla and 25% to International has ample support in the record. The jury heard testimony that Tesla had information from Shell regarding the location of the drilling rig and the layout of its submerged mooring lines but failed to share this information with the crew of the THUNDER. International also offered considerable evidence that its captain's lack of a towing license was unrelated to the cause of the accident. Tesla did not contest that it controlled the implementation of the survey. Further, a Shell employee testified at trial that Tesla failed to provide him with timely and accurate information about the accident, causing Shell to incur additional damages. Although Tesla maintains that it acted in good faith after the allision, the jury was free to weigh the evidence and reach its own conclusions regarding Tesla's actions.
Tesla argues that the jury should nevertheless have found International to be at least equally at fault for Shell's damages because the captain of the THUNDER lacked experience in sonar surveying, failed to pay attention to the location of the towfish and possible collision risks, and violated other legal duties. In support of this position, Tesla cites numerous cases in which vessels were found to be 50% or more at fault for accidents. The referenced cases are factually dissimilar from the circumstances here, and none involved the reversal of a jury verdict. It is for the jury, and not the court, "to weigh conflicting evidence and inferences, and determine the credibility of witnesses." Boh Bros. Constr. Co. , 731 F.3d at 452 (quoting Roman v. W. Mfg., Inc. , 691 F.3d 686, 692 (5th Cir. 2012) ). Although there was some evidence of fault by International and its employees, a reasonable jury could nonetheless find Tesla more responsible for Shell's damages.
B.
Tesla also appeals the district court's calculation of the contribution amount due by International. After trial, International paid Shell $244,918.99 in partial satisfaction of judgment. This payment was in lieu of posting a supersedeas bond, and without prejudice to International's right to challenge the judgment on appeal. Tesla and Shell later agreed to settle all of Shell's claims in exchange for *924 $8,771,918.99. The settlement agreement states that this sum resolves "any liability or damages owed by Tesla Offshore and International" and "is to be funded in two parts: (a) by $8,527,000 in new money from the Tesla Underwriters to be paid on or before December 19, 2016, and (b) by $244,918.99 in funds previously collected by Shell from International."
Following the settlement, Tesla argued that it was entitled to contribution from International. The district court entered summary judgment in favor of Tesla on its contribution claim and held that International owed Tesla $1,948.060.76. This represented 25% of the total settlement amount, minus the $244,918.99 previously paid by International. On appeal, Tesla argues that International is not entitled to credit for its earlier payment to Shell because this payment was conditional on the outcome of the appeal. As part of the settlement agreement, Tesla agreed to indemnify Shell if International prevails on appeal and becomes entitled to repayment of some of its money.
But Tesla does not dispute that International actually paid the amount in question, and that Shell kept the money. It is clear from the language of the settlement agreement that International's partial payment was credited toward the total amount due and therefore reduced the amount of new money owed by Tesla. There is no logical basis to require International to make the same payment twice, especially when Tesla already received the benefit of the first payment.
In the alternative, Tesla argues that International's payment should be credited to both International and Tesla because the parties are jointly liable. Tesla offers no legal authority for this proposition. Notably, the district court gave Tesla sole credit for the $8,527,000 it contributed to the settlement. Tesla does not contest this decision, and does not explain why International's payment should be treated differently. We see no error in the district court's contribution calculations. AFFIRMED.

Shell sued three International entities: International Offshore Services, LLC, International Boat Rentals, Inc., and International Marine, LLC. International Boat Rentals is no longer a party to this litigation. We refer to the other two International entities as "International."

This provision was recently renumbered. At the time of the relevant events, the same definition of towing vessel was at 46 U.S.C. § 2101(40).

International briefly argues that the THUNDER is not a "commercial" vessel because it does not meet the statute's definition of "commercial service." "[C]ommercial service" is defined to include "any type of trade or business involving the transportation of goods or individuals, except service performed by a combatant vessel." 46 U.S.C. § 2101(4). International asserts that the THUNDER was not transporting personnel or cargo in commerce within the meaning of traditional maritime jurisprudence. But International failed to present this argument to the district court, and has therefore forfeited it on appeal. See Celanese Corp. v. Martin K. Eby Constr. Co. , 620 F.3d 529, 531 (5th Cir. 2010). Regardless, the term "commercial service" is broad enough to cover the THUNDER's commercial activity in transporting Tesla's equipment.

Although this regulation was not in place at the time of the events in question, it supports the view that towing is not generally understood to be limited to towing other vessels.