REID, Judge.
This is a suit for damages brought by the Department of Highways of the State of Louisiana, against Southern Shipbuilding Corporation, owner of the tug “F. N. Canulette”, for damages to its highway bridge known as the Danziger Bridge, which bridge spans the Inner Harbor Navigation Canal in the Port of New Orleans between the Mississippi River and Lake Ponchatrain. The defendant filed an answer and also a third party petition against Indian Towing Company and American Marine Corporation. American Marine owned the tug “Winnie” but had chartered it to Indian Towing Company. Indian Towing Company was the owner of the barge Margaret Sheridan, which was under tow at the time of the accident. Defendants Indian Towing Company and American Marine Corporation reconvened against Southern Shipbuilding Corporation, claiming damages to the Margaret Sheridan caused by the collision.
At the trial it was stipulated that the damages to the bridge were $5,612.76 and that the Department of Highways, as owner of the bridge, was entitled to recover this amount from one or both of the parties, Indian Towing or Southern Shipbuilding. It was further stipulated that American Marine Corporation, third party defendant, owned the “Winnie” but had chartered it to the defendant Indian Towing Company and, therefore, the Indian Towing Company would be the proper party to stand in judgment and that American Marine should be dropped as a defendant. It was further stipulated that the barge Margaret Sheridan was damaged to the extent of $3,717.00 and that Southern Shipbuilding Corporation did repair the said vessel but at that time had not submitted a bill for the work. It was also stipulated that Southern Shipbuilding was the owner and operator of the “Canulette” and the proper party to stand in judgment for the actions of the “Canulette” and that the same applied to Indian Towing Company insofar as the actions of the “Winnie” were concerned.
For written reasons assigned the Trial Judge found that the tugs “Canulette” and “Winnie” were mutually at fault in causing the barge “Margaret Sheridan” to collide with the Danziger Bridge. He then rendered judgment in favor of the Department of Highways of the State of Louisiana and against Southern Shipbuilding Corporation, owner of the “Canulette”, in the full sum of $5,612.76, together with costs and interest from judicial demand. He also rendered judgment in favor of the third party plaintiff, Southern Shipbuilding Corporation, and against third party defendant, Indian Towing Company, for one-half of the aforesaid sum paid to plaintiff, the Department of Highways of the State of Louisiana, and one-half of the cost of repairs to the “Margaret Sheridan” and, accordingly, that Southern Shipbuilding Corporation recover from third party defendant, Indian Towing Company, the full sum of $4,664.88, with interest and costs. The judgment was rendered on June 12, 1967, and was read and signed June 29, 1967.
Subsequent to the rendition of the judgment, the parties entered into an order to satisfy the judgment in favor of the Department of Highways, in which the Department of Highways suggested to the Court that it had been paid the sum of $5,612.76 by Southern Shipbuilding Corporation and that it was stipulated by all parties that the satisfaction of the judgment by Southern Shipbuilding Corporation was made without prejudice to its rights and defenses and the rights and defenses of the third party defendant Indian Towing Company in the prosecution of any appeal and cross appeal from the said judgment, and that payment by Southern Shipbuilding *499 Corporation to the plaintiff was not to be construed as an admission of liability on its part. This order was entered on August 3, 1967.
It is from that portion of the judgment which cast the third party defendant, Indian Towing Company, liable for one-half the damages assessed in favor of the Department of Highways and for one-half of the repairs to the barge “Margaret Sheridan” that this appeal is taken.
The facts in this case show that on March 11, 1966, the tug “Canulette” was dispatched to the American Marine Corporation’s yard on the Industrial Canal to tow the barge “Margaret Sheridan” to Southern Shipbuilding Corporation’s yard at Slidell, Louisiana, for repairs. The master of the “Canulette” requested assistance from Indian Towing Company in towing the “Sheridan”. The “Winnie” was assigned to aid in the movement through the Industrial Canal, through the various bridges, and into Lake Poncha-train. The “Winnie” was to leave the tow right after the barge cleared the Seabrook Bridge.
The record shows that before beginning the towing job, the masters of the two tugs discussed the undertaking and it is undisputed that the “Canulette” was to be the lead tug and it was in complete charge of the flotilla navigation. The “Canulette” was to tow the “Sheridan” astern on a bridle and hawser. The “Winnie” was made up by one line close to the stern of the two with her engine idling. At the time of the making up of the tow the captains had agreed upon a system of signals. Two blasts of the “Canulette’s” whistle was to order the “Winnie” to go astern, and a single blast from the “Canulette” indicated that the “Winnie” was to stop her engines. As the tow approached the Danziger Bridge spanning the Inner Harbor Navigation Canal in the Port of New Orleans, the bridge was opened so the flotilla could pass through. The record shows there was a fairly strong tide running in the canal underfoot of the tow. This current was running in the same direction as the flotilla was proceeding. The record shows that the “Canulette” allowed the “Sheridan” to sheer to the right. The sheer to the right was broken by a maneuver of the “Can-ulette” but then the “Sheridan” began to sheer to the left or the west bank of the canal. Then the “Canulette” attempted to break this sheer by pulling hard in the opposite direction at full speed. However, this maneuver failed and the captain sounded two blasts of the whistle to tell the “Winnie” to reverse engines. The “Winnie” complied, but in doing so her towline broke. There is a dispute as to whether or not the “Sheridan” collided with the bridge before or after the towline broke.
There is no dispute as to the facts concerning the sheering of the barge or of the failure of the “Canulette” to stop the sheering. Neither is there any dispute as to the negligence of the “Canulette” as counsel for appellee concedes this in his brief and bases his case on recovering as a third party plaintiff on the doctrine of the joint fault of both vessels.
The main points at issue are whether or not the breaking of the tow line between the “Sheridan” and the “Winnie” was the proximate cause of the accident, or whether or not the failure of the master of the “Winnie” to timely notify the master of the “Canulette” of the sheering of the barge was the proximate cause of the accident which would permit the doctrine of mutual fault to apply.
It is the position of the defendant-appellant, Indian Towing Company, that the collision with the bridge was inevitable at the time the “Canulette” signaled the master of the “Winnie” to reverse his engines, and that the “Sheridan” had either struck the bridge simultaneously with the giving of the signal, or the signal was given too late to prevent the “Sheridan” from striking the bridge, regardless of whether or not the towline had snapped.
*500 The defendant-appellee, Southern Shipbuilding Corporation, argues that the signal was timely given, and the snapping of the towline plus the failure of the master of the “Winnie” to timely notify the master of the “Canulette” of the sheering of the “Sheridan” were the proximate causes of the accident and, therefore, the doctrine of mutual fault should apply.
It is undisputed that this action arises from a maritime tort on navigable waters, and that the substantive maritime law applies.
In his reasons for judgment, the Trial Judge makes no definitive finding of fact as to the cause of the collision, despite contrary statements of both parties. While apparently being inclined to take the position that the barge would have struck the bridge regardless of the snapping of the towline, the Judge felt that the ,two captains did not take the situation as seriously as they should have and, therefore, both tugs were sufficiently at fault for a finding of mutual fault in which the damages should be divided. It was on these issues that the third party defendant-appellant, Indian Towing Company, has appealed.
The prime issue before this Court is whether or not the breaking of the towline between the “Sheridan” and the “Winnie” was a proximate cause of the accident, and if so, was the master of the “Winnie” negligent in any manner in connection therewith.
It is admitted that in any towing situation calling for the use of more than one tug, the master of one of the tugs has to assume the responsibility for the navigation of the flotilla. It is undisputed in this case that the master of the “Canulette” was in complete charge of the navigation of the flotilla and that the “Winnie” was acting in the capacity of a helper. This is borne out by the testimony of the Captain of the “Canulette”, Harry Bell, as follows:
“Q. The only function of the Winnie was to back down if you ordered her to back down. Is that correct?
A. Her function was to stop the tow.
Q. If you told her to ?
A. If I so ordered, to keep it from hitting something. * * *”
Further evidence of this appears in the testimony of the Captain of the “Winnie”, Robert C. Welsh, as follows :
“Q. What plans, or what did you discuss with the Captain of the Canu-lette prior to getting under way in the event the barge should sheer to one side of the channel to another?
A. No plans concerning a sheer.
Q. What plans did you make ?
A. Just what our signals would be to stop, for me to stop the vessel.”
It would be clear under the maritime jurisprudence that in lieu of some positive act of negligence on the part of the “Winnie,” the sole liability in a case like this, between the towing tug and her helper, is cast on the towing tug.
In The Connecticut, 103 U.S. 710, 26 L.Ed. 467 (1881), the United States Supreme Court was called upon to determine liability between a towing tug and her helper. The Court held as follows:
“So far as The STEPHENS is concerned, she was clearly not to blame. She was the mere servant of THE CONNECTICUT, and no part of the responsibility of the navigation, so far as the approaching vessel was concerned, was on her. It was not her duty to signal the movements to THE CONNECTICUT, under whose exclusive control she was. The CONNECTICUT is alone responsible for the consequences of her own faults.”
This determination of liability between tugs engaging in joint ventures *501 turns upon the doctrine of “dominant mind” to the effect that the helper tug is not liable for damages proximately caused by the faulty navigation of the superior or dominant vessel unless the helper is guilty of independent fault which contributes to the casualty. See Willis v. Tugs TRAMP and MARS, 216 F.Supp. 901 (E.D.Va.1963).
There is some dispute in the testimony as to whether or not the actions of the master of the “Canulette” in blowing the whistle and ordering the “Winnie” by voice radio to immediately put her engines astern, occurred simultaneously with the barge striking the bridge or whether it occurred before the barge struck the bridge. The predominance of the evidence, however, is to the effect that these occurred almost simultaneously. Mr. Hardy Smith, the bridge tender at the Danziger Bridge, testified that the collision occurred almost immediately after he had heard the two-blast whistle signal, and on cross-examination he was asked :
“Q. What happened immediately after he blew the signal ?”
and he answered:
“A. Well, the ship struck the fender system.”
Captain Robert C. Welsh, master of the “Winnie”, testified that he received the voice signal simultaneously with the impact. James L. Welsh, deck hand on the “Winnie”, testified that the two-blast signal and the voice message occurred simultaneously with the impact. Captain Welsh further testified that the towline broke after he got the vessel completely stopped.
The most damaging testimony to the ap-pellee’s position is that of Captain Bell, master of the “Canulette”, who testified that at the time he gave the signal to go astern, the “Sheridan” was approximately 60 feet from the point of impact, moving at a speed of about 3 knots, and that it would have taken the “Winnie” at least a minute to stop the “Sheridan” under the existing conditions. He said that with the barge traveling 2 knots the barge would have gone about 60 feet. Therefore, by his own testimony it would have been impossible for the “Winnie” to have stopped the barge from hitting the side of the bridge. He further said:
“Q. So that at the time you gave the order to go astern, there was already danger of collision and it was questionable whether it was going to happen or not. Is that correct:
A. That is correct.
Q. You had tried to steer out of it before and had hoped that you could make it without calling on the Winnie. Correct?
A. That is correct.
Q. And whether the Winnie succeeded, whether the Winnie’s line had popped or not, you couldn’t tell whether there was going to be a collision or not. Is that correct?
A. Well, if, no. That’s not so.
Q. Well, I’m saying that at the time you gave the order to go astern, you couldn’t tell even if the line had not popped, whether a collision was going to take place. It might have even if the line hadn’t broken ?
A. I doubt seriously if it would have if the line would have held.
Q. But it could have ?
A. It could have.”
It is the conclusion of this Court that the collision would have occurred regardless of whether or not the towline had snapped. Therefore, insofar as this allegation of negligence is concerned, it is not necessary for this Court to go further into the question of whether or not the Captain of the “Winnie” was negligent or not negligent in his choice of towline to be used.
*502 The other argument advanced by the third-party plaintiff was that, even assuming that the “Winnie’s” towline was in good condition, the “Winnie” failed to keep the tailend of the tow in line, the task to which it was assigned. This argument is apparently based on the proposition that the captain of the “Winnie” had observed the sheering of the barge and had not informed the captain of the “Canulette” of this fact. However, an examination of the testimony of the captain of the “Canulette” clearly shows that he was cognizant of the sheering from the moment it started. He said:
“Well, we made passage through L. & N. perfect. Right through the center, didn’t rub either side. We was towing pretty and were working with a fair tide, which we had about 2 or 2i/£ knots fair tide which I’d say we were going 3 maybe 3^ knots speed because I had to keep way on the vessel to steer it with a fair tide. As we cleared the L. & N. they carried the stern to the starboard which caused it to get a little sheer to the port and I figured well, I would pull it, hook up and get it straight. I pulled a little bit to the starboard. Still nothing happened, and I pulled harder to the starboard and it looked like it started to come. Then I was getting pretty close on to Highway 90 which was open and I thought it wasn’t going to open up. I blowed two whistles for Red to back it down and stop it. Also I talked to him on the radio and told him to stop the vessel and he had backed down and when he backed down and stopped it we heard the line pop.”
It is therefore clear that any warning the Captain of the “Winnie” had given in this regard would only have confirmed the knowledge the Captain of the “Canulette” already had.
The record clearly shows that the “Winnie” could exercise no control over the forward motion of the tow. The only action the “Winnie” could take would have been to position itself so that it could stop the tow if necessary. This is confirmed by the Captain of the “Canulette” who testified that the sole function of the “Winnie” was to stop the tow if so ordered. The “Winnie” was to follow the tow with her engines idling. As counsel for third party defendant stated in his brief, in a very real sense the “Winnie” was being towed also. Her captain was under the direct orders of the captain of the “Canulette” and she could take no independent actions without being so ordered. It is again pointed out that the captain of the “Canulette” testified he had not given the signal for the “Winnie” to back when he first noted the danger of the sheering but had attempted to correct the situation himself. It is the opinion of this Court that the situation was out of control at the time he gave the signal for the “Winnie” to back up and that the sole proximate cause of the accident was this negligence on the part of the captain of the “Canulette”.
We are well aware of the general rule that the findings of fact of a Trial Judge should not be disturbed unless clearly erroneous. However, we again wish to point out that the Trial Judge’s reasons for judgment do not contain any definite definitive finding of fact upon which it could be held that the “Winnie” was negligent in any manner. Most of the Trial Court’s reasons are statements of what the witnesses said rather than any finding of fact. We therefore feel that the above mentioned doctrine is not applicable.
For the above and foregoing reasons, the judgment of the District Court insofar as it holds the appellant, Indian Towing Company, liable is reversed and third party plaintiff Southern Shipbuilding Corporation’s third party petition should be dismissed at its cost.
Reversed.