# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30424

United States Court of Appeals
Fifth Circuit

**FILED**
February 15, 2018

Lyle W. Cayce
Clerk

CONTINENTAL INSURANCE COMPANY,

Plaintiff,

versus

L&L MARINE TRANSPORTATION, INCORPORATED,

Defendant.

\* \* \* \* \*

P & I UNDERWRITERS, Subscribing to Policy Number B0507M13PP07280,

Plaintiff–Appellee,

versus

ATLANTIC SPECIALTY INSURANCE COMPANY,

Defendant–Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before REAVLEY, SMITH, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Three tugs were towing a barge, with one designated as the "lead" tug

No. 17-30424

and the other two as "assisting" tugs. One of the assisting tugs allided with a bridge fender system and sank. An insurance policy on the lead tug covers damage only to its "tow." Accordingly, we decide the meaning of "tow" for purposes of that insurance contract and whether the assisting tug was the "tow" of the lead tug. The district court held that the assisting tug was the "tow" because of a tort principle known as the "dominant mind" doctrine. We reverse and render.

I.

Three tugs—the M/V MISS DOROTHY, the M/V ANGELA RAE, and the M/V FREEDOM—were traversing the Mississippi River with a barge, FSB 101. The MISS DOROTHY allided with a portion of a bridge fender system and sank, resulting in a total loss. Accordingly, its insurers, Continental Insurance Company ("Continental"), filed a complaint against the ANGELA RAE's owners, L&L Marine Transportation, Incorporated ("L&L"). According to Continental's complaint,

> At the time of the allision, the M/V MISS DOROTHY was assisting the M/V ANGELA RAE, and the M/V FREEDOM, with the towage of FSB 101 . . . . Both the M/V ANGELA RAE and M/V FREEDOM were positioned behind FSB 101, pushing it down the river, and the M/V MISS DOROTHY was positioned at the head of FSB 101.

Most importantly to the present dispute, Continental alleged that "[t]he M/V ANGELA RAE was the lead tug and was responsible for coordination of the tow." Continental further averred that the ANGELA RAE was negligent in several ways, including "failure to keep a proper look out; failure to properly navigate around the Sunshine Bridge fender system; [and] failure to chart and plan a proper and safe route."

Both Atlantic Specialty Insurance Company ("Atlantic Specialty") and P & I Underwriters ("P & I") insured the ANGELA RAE. This is a dispute

between them regarding whose policy covers the incident.[1]  Atlantic Specialty is the Hull & Machinery insurer, while P & I provides Protection and Indemnity Insurance.  Following the above complaint, Atlantic Specialty denied that its policy covered any liability for the MISS DOROTHY's allision and sinking.  Accordingly, P & I filed a complaint against Atlantic Specialty, claiming that the Atlantic Specialty policy did so cover.  P & I's coverage complaint was initially consolidated with Continental's tort suit against L&L, then severed by joint motion.

The parties cross-moved for summary judgment, each alleging that the other's policy covered any liability for the loss of the MISS DOROTHY.  As relevant here, Atlantic Specialty's policy insures the ANGELA RAE as follows:

> [I]f the Vessel hereby insured shall come into collision with any other vessel, craft, or structure, floating or otherwise (including her tow); or shall strand her tow or shall cause her tow to come into collision with any other vessel, craft, or structure, floating or otherwise, or shall cause any other loss or damage to her tow or to the freight thereof or to the property on board, and the Assured, or the Surety, in consequence of the insured Vessel being at fault, shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums we, the Underwriters, will pay.

Essentially, the Atlantic Specialty policy covers the following situations: (1) the ANGELA RAE collides with something else, (2) the ANGELA RAE strands her tow, (3) the ANGELA RAE causes her tow to come into collision with anything else, or (4) the ANGELA RAE causes any damage to her tow or to her tow's freight.  As Atlantic Specialty maintains, none of those situations occurred.  The ANGELA RAE never collided with anything, nor was her tow stranded, subject to collision, or damaged in any way.

---

[1] As an initial matter, P & I moved for partial summary judgment, insisting that Atlantic Specialty had a duty to defend the insured, L&L.  The district court denied that motion in part, reasoning that the Atlantic Specialty Hull & Machinery policy was not a defense policy and created no duty to defend.  P & I does not raise that issue on appeal.

No. 17-30424

Conversely, P & I's policy is much broader, indemnifying L&L for "[l]iability for loss of or damage to any other vessel or craft, or to property on such other vessel or craft . . . provided such liability does not arise by reason of a contract made by the assured." Yet P & I is suing because *its* policy covers only situations that Atlantic Specialty's does *not*: "Nonwithstanding anything to the contrary contained in this policy, no liability attaches to the Assurer [f]or any loss, damage, or expense which would be payable under the terms of the {Response} form of policy on hull and machinery." It is undisputed that, if Atlantic Specialty's policy does not cover this incident, then P & I's does.

Accordingly, P & I contends that the loss of the MISS DOROTHY falls within the third situation covered by Atlantic Specialty's policy, *i.e.* that the ANGELA RAE caused her "tow" to come into collision with the fender system. P & I reasons that the MISS DOROTHY was the "tow" of the ANGELA RAE—despite being itself a tugboat—because the ANGELA RAE was allegedly the *lead* tug. The district court agreed with P & I and granted it summary judgment. Atlantic Specialty appeals.

II.

As a preliminary matter, the parties dispute whether the so-called "Eight Corners" rule governs this case. Under it, courts "assess whether there is a duty to defend by applying the allegations of the compliant to the underlying policy without resort to extrinsic evidence." *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 872 (5th Cir. 2009). Put another way, the court determines whether an insurance policy covers an incident by looking to the allegations in the underlying suit's complaint. *See id.* P & I has consistently maintained, before the district court and on appeal, that the rule applies.

For the first time on appeal—and only in its reply brief—Atlantic Specialty disputes the application of the rule. Accordingly, the district court

No. 17-30424

stated, "The parties do not dispute [that] the allegations in the complaint control which policy is liable for defense costs and coverage." Thus, Atlantic Specialty has waived any quarrel over the applicability of the Eight Corners rule and the controlling nature of Continental's complaint.[2] Accordingly, we assume the facts in Continental's complaint—the ANGELA RAE was the lead tug; the MISS DOROTHY was assisting the ANGELA RAE with the towage of FSB 101; and the ANGELA RAE negligently caused the MISS DOROTHY's allision.

## III.

With these facts assumed, we turn to the central issue:  Was the MISS DOROTHY the "tow" of the ANGELA RAE for purposes of Atlantic Specialty's policy?  Both sides agree that Louisiana law controls.[3]  Under Louisiana law, the interpretation of insurance policies is governed by general rules of contract interpretation. *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). Accordingly, courts "should seek to determine the parties' common intent, as reflected by the words in the policy." *Gabarick v. Laurin Maritime (Am.), Inc.*, 650 F.3d 545, 553 (5th Cir. 2011) (internal quotations omitted).  "The words of a contract must be given their generally prevailing meaning" or their technical

---

[2] *See Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 316–17 (5th Cir. 2000) ("It is a bedrock principle of appellate review that claims raised for the first time on appeal will not be considered."). Even looking past waiver, it is not clear why this disagreement makes an ounce of difference here. The relevant facts are that the ANGELA RAE and the MISS DOROTHY were chartered to tow the barge FSB 101 while the ANGELA RAE was the lead tug. Nowhere does Atlantic Specialty dispute that the ANGELA RAE was the lead tug; all that it contests is the legal import of that fact. According to the district court and P & I, the assisting tugs are the "tow" of the lead tug; conversely, Atlantic Specialty maintains that the assisting tugs are still tugs, not tows. Thus, whether the Eight Corners analysis appertains is irrelevant—we need only ask how to read the word "tow" in Atlantic Specialty's policy.

[3] *See Richard v. Dolphin Drilling Ltd.*, 832 F.3d 246, 248 (5th Cir. 2016); *Cal-Dive Int'l, Inc. v. Seabright Ins. Co.*, 627 F.3d 110, 113 (5th Cir. 2010) ("The interpretation of a marine policy of insurance is governed by relevant state law.").

No. 17-30424

meaning "when the contract involves a technical matter."[4]  If the words of the contract "are unambiguous and the parties' intent is clear, the insurance contract will be enforced as written."[5]

## A.

Because we look for the "plain, ordinary and generally prevailing meaning" or "technical meaning" of the word "tow," we begin with the dictionary. *See Cadwallader*, 848 So. 2d at 580–81.  Dictionary definitions almost uniformly point toward the following definition of "tow": a vessel that is being provided extra motive power from another vessel by being pushed or pulled. For example, Black's Law Dictionary defines "towage" as "[t]he act or service of towing ships . . . by means of a small vessel called a *tug*."[6]  That indicates that the "tug" is actively "towing" or exerting some force on the "tow."  Supporting this, Merriam-Webster defines the verb "tow" as "to draw or pull along behind" or "to move in tow."[7]  The Oxford English Dictionary agrees, defining the verb "tow" as "[t]o draw by force; to pull, drag."[8]  Furthermore, Oxford defines the noun "tow" as "[t]he action of towing or fact of being towed" or as "[a] vessel taken in tow; also, string of boats, barges, etc. being towed.  Hence also, a string of barges that is pushed rather than pulled."[9]

---

[4] LA. CIV. CODE ANN. art. 2047; *see also Naquin v. Elevating Boats, L.L.C.*, 817 F.3d 235, 238 (5th Cir. 2016); *Cadwallader*, 848 So. 2d at 580.

[5] *Naquin*, 817 F.3d at 238–39 (quoting *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2000)); *see also* LA. CIV. CODE ANN. art. 2046.

[6] *Towage*, BLACK'S LAW DICTIONARY 1719 (10th ed. 2014).

[7] *Tow*, MERRIAM-WEBSTER (Online ed.), https://www.merriam-webster.com/dictionary/tow.

[8] *Tow*, OXFORD ENGLISH DICTIONARY (Online ed.), http://www.oed.com/view/Entry/203995?rsk ey=nHWNmf&result=7#eid.

[9] *Tow*, OXFORD ENGLISH DICTIONARY (Online ed.), http://www.oed.com/view/Entry/203993?rsk ey=nH WNmf&result=5&isAdvanced=false#eid. This dictionary also includes a possibility that "[a] vessel that tows; a tug" is also a defined as a "tow."  We discount this because it plainly cannot be the meaning of "tow" in the

No. 17-30424

Caselaw and treatises support those definitions. The Supreme Court explained tows and towage in *Stevens v. The White City*, 285 U.S. 195, 200 (1932):

> The supplying of power by a vessel, usually one propelled by steam, to tow or draw another is towage. Many vessels, such as barges and canal boats, have no power of their own and are built with a view to receiving their propelling force from other sources. And vessels having motive power often employ auxiliary power to assist them in moving about harbors and docks.[10]

Fifth Circuit precedent accords with this notion. In *Mississippi Valley Barge Line Co. v. Indian Towing Co.*, 232 F.2d 750, 753 n.5 (5th Cir. 1956), the court noted that "[towage] is the employment of one vessel to expedite the voyage of another." Finally, at least one treatise defines "[t]owage" as "a service rendered by one vessel to aid the propulsion or to expedite the movement of another vessel. The vessel that supplies the power . . . is typically called a *tug*." THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 12-1 (West 5th ed. 2017) ("SCHOENBAUM").

Therefore, dictionaries, cases, and treatises all point to a common understanding of "tow": some ship or boat that is being provided extra motive power from another ship or boat by being pushed or pulled.[11] As P & I rightly contends, the tow may have its own power—such as cruise ships or tankers being

_____

contract—any other tug would then be a "tow," including the ANGELA RAE. Even P & I does not read the Atlantic Specialty policy so broadly. And no other dictionary, case, or treaties defines "tow" in a similar way, indicating that this was not what the parties intended.

[10] Similarly, in *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 328 (1927), the Court defined "[t]owage service" as "the employment of one vessel to expedite the voyage of another."

[11] As P & I reads these dictionaries, cases, and treatises, the common thread is that "towage is one vessel with some responsibility for the steering or navigation of another vessel or object." But none of these dictionaries or cases defines "towage" in relation to the responsibilities of a vessel—a concept that P & I inserts without support. Instead, the plain definition of "tow" requires that it be provided some motive power. P & I's reading is without merit.

Furthermore, P & I asserts that its definition of "tow" is the only one that is clean and

7

towed into a harbor—but the ship being towed is designated as the "tow" precisely because it receives auxiliary motive power from the tug or towing vessel.

Under this plain-meaning approach, it is evident that the MISS DOROTHY was *not* the "tow" of the ANGELA RAE. Nowhere is there indication that the ANGELA RAE was providing the MISS DOROTHY with any motive power or was pushing or pulling her in any way.[12] Rather, Continental's claim is that the ANGELA RAE was the *lead* tug—and that since the MISS DOROTHY was an *assisting* tug, also pulling the barge FSB 101, the ANGELA RAE was responsible for the safe navigation of the MISS DOROTHY. But under those facts, there is no reason to characterize the MISS DOROTHY as the "tow" of the ANGELA RAE.

## B.

In the face of this plain meaning uniformly articulated by dictionaries, treatises, and cases alike, P & I urges that we define "tow" as a vessel for whose safe navigation another vessel has responsibility. That is, P & I insists that we apply a maritime tort law concept—the "dominant mind" doctrine—to define "tow" in this insurance contract. We decline that invitation.

In any given flotilla, tugs generally have the following duties to their

---

easily applied. Yet there is no reason to think that the plain meaning of "tow," articulated above, is not also clean and easily applied. It will likely be plain in almost every case whether one ship is providing another auxiliary momentum. To the contrary, as explained below, it is P & I's definition of "tow" that will likely lead to confusion—there may be instances in which the vessel being towed has responsibility for the navigation of the tug.

[12] P & I claims that the MISS DOROTHY "alleges the MISS DOROTHY, though it had motive power, in effect used the ANGELA RAE as 'auxiliary power to assist [it] in moving about.'" That quotation comes, however, from *Stevens*, 285 U.S. at 200—not from Continental's complaint. We find no indication in the record that the MISS DOROTHY used the ANGELA RAE for extra motive power. Rather, Continental's complaint cuts the other direction. As Continental alleges, the MISS DOROTHY was "traversing the Mississippi River with barge FSB 101 . . . in tow." Thus, Continental's complaint squares with the notion that all three tugs were jointly pulling the barge. And other than this singular allegation by P & I, the parties seem to agree that these are the facts upon which we should decide this case.

No. 17-30424

tows: reasonable navigation, providing a proper towing apparatus, having a qualified master and crew, following proper towing procedures, etc. SCHOEN-BAUM § 12-3. In turn, a tow has duties such as providing a seaworthy vessel, being properly manned, and following the instructions of the tug. *Id.* § 12-5.

The dominant mind doctrine usually kicks in where a flotilla—*i.e.* the tugs and tows as unit—causes damage to some third party.[13] Typically courts hold only the tug liable, given that it is usually in control of the operation, having the duty of reasonable navigation. *Id.* § 12-6. Furthermore, the doctrine can absolve helper tugs of liability "if they are merely following instructions of the tug in charge." *Id.* Yet this is merely a rebuttable presumption—the tow or helper tug may be liable if negligent,[14] or the tow itself may be the dominant mind.[15] Finally, the dominant mind doctrine can sometimes be used where a tow itself is damaged—in such situations, a tug that was the dominant mind may have had the duty of safely navigating the tow and may be liable.[16]

---

[13] *See* SCHOENBAUM § 12-6; *Melbourne Bros. Constr. Co. v. Gnots-Reserve*, 461 So. 2d 1145, 1148 (La. Ct. App. 5th Cir. 1984); *Dep't of Highways v. S. Shipbuilding Corp.*, 217 So. 2d 497, 500–02 (La. Ct. App. 1st Cir. 1969).

[14] SCHOENBAUM § 12-6; *see also Chitty v. M/V Valley Voyager*, 408 F.2d 1354, 1356–58 (5th Cir. 1969) (finding that a refueling tug, which effectively became the "tow" of the lead tug because it docked with the barge and mostly shut down its engines, was negligent by failing to warn the lead tug of excessive speed); *Commercial Union Ins. Co. v. M/V Bill Andrews*, 624 F.2d 643, 646–48 (similarly finding that a tug was mostly liable for the sinking of a refueling tug that was effectively a tow but that the refueling tug was also somewhat liable); *S. Shipbuilding*, 217 So. 2d at 502 ("[T]he helper tug is not liable for damages proximately caused by the faulty navigation of the superior or dominant vessel unless the helper is guilty of independent fault which contributes to the casualty.").

[15] *See, e.g.*, *Plains Pipeline, L.P. v. Great Lakes Dredge & Dock Co.*, 54 F. Supp. 3d 586, 589–91 (E.D. La. 2014) ("The tow in this instance acted as the 'dominant mind, instructing the tug captains on the location to bring the dredge as well as how the dredge would be anchored.'"). Furthermore, at least in admiralty cases, both tugs can be jointly at fault if neither "surrendered command to the other." *Cenac Towing Co. v. Keystone Shipping Co.*, 404 F.2d 698, 701–02 (5th Cir. 1968).

[16] *See, e.g.*, *Commercial Union*, 624 F.2d at 647 (finding that a tug had duties to a refueling tug that "became an appendage" of the lead tug); *Chitty*, 408 F.2d at 1356–57 (noting the district court's finding that the lead tug was negligent for failing to negotiate a river

According to the district court and P & I, a tug that is the dominant mind of a flotilla, with the accompanying responsibilities, necessarily must view the rest of the flotilla as its "tow." Because Continental avers that the ANGELA RAE was the lead tug and responsible for the navigation of the flotilla, P & I infers that the MISS DOROTHY was the "tow" of the ANGELA RAE. As P & I reasons, the ANGELA RAE owed the same duty of safe navigation to the MISS DOROTHY as it did to the barge, FSB 101—thus, they are both the "tow" of the ANGELA RAE.

We disagree. First, there is little reason to think that these tort duties should govern the meaning of "tow" in Atlantic Specialty's policy. Tort duties are precisely that: responsibilities that the parties owe to each other. But there is no reason to think that these duties then *define* the meaning of "tow." At least in other contexts, there is good reason to think that using tort duties to define contractual terms would be wholly inappropriate.[17]

Of course, some terms of insurance contracts might turn on tort law concepts. If an insurance contract exempts employees who "assault" other employees, then the tort law concept of "assault" is probably at play. Or a contract that indemnifies a party only for acts that they "proximately cause" would likely import that tort concept. But such terms usually derive their primary meaning from the relevant tort principles. Conversely, "tow" has a plain and unambiguous meaning outside tort law or the dominant mind doctrine, as

---

bend safely and thus was liable to a refueling tug that effectively became the tow).

[17] For example, take a parent who has a $100,000 life insurance policy with his "children" as the beneficiaries. Assume that the parent is acting as a chaperone for a field trip when he is killed and that the relevant state law of *in loco parentis* imposes the same duty of care on field-trip chaperones that any parent has over a child. Surely the insurance policy does not then distribute the $100,000 equally to all of the children to whom the parent owed that duty. The term "children" in the life insurance policy, everyone would know, would not turn on the tort duty of *in loco parentis*.

evidenced by the above-discussed cases, dictionaries, and treatises. Therefore, there is little reason to think that the meaning of "tow" in an insurance contract should be derived from tort law as opposed to its ordinary definition.[18]

Our conclusion is buttressed by the confusion we encounter when trying to determine how to use tort duties to define "tow." As discussed above, tugs have several duties to their tows, only one of which is the duty of safe navigation. *See* SCHOENBAUM § 12-3. P & I gives no reason to think that the word "tow" should be defined by that duty of safe navigation instead of, for example, the duty to provide a proper towing apparatus. *Cf. id.* Indeed, the duty to provide a proper towing apparatus seems more specific to tows and tugs. And presumably, a lead tug would not have that duty to an assisting tug.

Furthermore, as mentioned above, the dominant mind doctrine is only a presumption. *See id.* § 12-6. It can be flipped; the tow can become the dominant mind. *See, e.g.*, *Plains Pipeline*, 54 F. Supp. 3d at 591; *cf.* SCHOENBAUM § 12-6. In such cases, it would be absurd to say that the tug is the "tow" of the tow. The word "tow," then, could not be defined by the dominant mind doctrine in every case. And if the word "tow" does not always follow the duties attached to the dominant mind, it is not clear why "tow" should ever be so defined.

There is another reason why using the dominant mind doctrine to define "tow" is strange: The doctrine does not impute the lead tug with *sole* responsibility for the safe navigation of the flotilla. *See* SCHOENBAUM § 12-6. As our caselaw make clear, even tugs that effectively become tows by relying on the lead tug's propulsion still have duties to inform the lead tug of any excessive speed, to use their rudders to avoid catastrophe, and to move to more secure

---

[18] Notably, P & I points to no case in which the dominant mind doctrine is used to define "tow" for an insurance contract.

positions if necessary.[19]  Accordingly, both tugs have duties regarding the safe navigation of the flotilla.

The concept of "dominant mind" just helps courts allocate the fault of the tugs, ensure that the lead tug has a duty of safe navigation, and determine who was more negligent.  Therefore, because liabilities flowing from the dominant mind doctrine are really a matter of degree rather than kind, it seems odd to use the doctrine as an ontological on/off switch when defining "tow."  That is especially true insofar as the assisting tug could possibly be more negligent in those duties regarding safe navigation.

## IV.

In sum, "tow" as used in Atlantic Specialty's policy is defined by its plain, ordinary meaning: a vessel that is provided auxiliary motive power by being pushed or pulled.  A tug remains a tug when it is tugging (*i.e.*, pushing or pulling), and a tow is a tow only when it is being towed (*i.e.* being pushed or pulled). And because the MISS DOROTHY was not provided any extra motive power, it was not a tow.  Atlantic Specialty's policy does not apply.

The summary judgment is REVERSED, and judgment is RENDERED for Atlantic Specialty.

---

[19] *Commercial Union*, 624 F.2d at 646–48; *Chitty*, 408 F.2d at 1356–58; *S. Shipbuilding*, 217 So. 2d at 502.