[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-13009

Non-Argument Calendar

_____

In Re:

The Complaint and Petition of Jersey Shore Boat Towing & Salvage, Inc.,

Absolute Boat Towing & Salvage, Inc., and their respective stockholders,

as owners and/or owners pro hac vice of the vessel, a 2.

_____

JERSEY SHORE BOAT TOWING & SALVAGE, INC.,

a New Jersey for-profit corporation,

ABSOLUTE BOAT TOWING & SALVAGE, INC.,

a Florida for-profit corporation, and their respective stockholders,

as owners and/or owners pro hac vice of the vessel,

d.b.a. Tow Boat U.S.,

Petitioners-Counter Defendants-Appellants,

2                     Opinion of the Court                    24-13009

*versus*

POTENTIAL CLAIMAINTS,

                                                        Respondents,

ABDEL-ILLAH ZIDAL,

                                        Claimant-Counter Claimant
                                       Third Party Plaintiff-Appellee,

BOAT AMERICA CORPORATION,

                                             Third Party Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-01779-WWB-RMN

_____

Before NEWSOM, BRANCH, and BLACK, Circuit Judges.

PER CURIAM:

        Abdel-Illah Zidal purchased a 1985 30' S2 9.2 C sailboat
named "Action" in the summer of 2020. A few months later, while

24-13009                Opinion of the Court                3

being towed with Zidal on board, the unpowered sailboat accidentally struck the underside of a bridge. This case arises from that allision.[1]

Jersey Shore Boat Towing & Salvage, Inc. (Jersey Shore) and Absolute Boat Towing & Salvage, Inc. (Absolute Boat) (collectively, Appellants) appeal the district court's November 13, 2023, order denying their motion for summary judgment to exonerate them from or limit their liability for the accident as a matter of law and granting in part Zidal's motion for summary judgment.[2] Appellants raise several issues on appeal, which we address in turn. After review,[3] we affirm the district court.

## I. BACKGROUND

Prior to the allision, Zidal anchored his sailboat on the Banana River in Brevard County, Florida, but the sailboat was set

---

[1] "An allision is the sudden impact of a vessel with a stationary object such as an anchored vessel or a pier. A collision, on the other hand, is the crashing together of two vessels." *Superior Constr. Co. v. Brock*, 445 F.3d 1334, 1336 n.1 (11th Cir. 2006) (quotation marks, alterations, and citations omitted).

[2] We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(3), which states that we have jurisdiction of appeals from "[i]nterlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed."

[3] We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court. *Am. Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996). "In admiralty, as in all civil cases, we consider the evidence in the light most favorable to the nonmoving party." *Id.*

adrift after inclement weather snapped the anchor's chain. The sailboat drifted to Mark Oakes' dock in Merritt Island, Florida, where it ran aground. Zidal and Oakes sought towing services to move the sailboat as it lacked an engine and was not equipped with working electronics or a radio. Zidal was a novice boat owner and did not know anything about boats.

Oakes contacted Charles Tharp, the owner and general manager of Absolute Boat, which specializes in towage and salvage, to tow the sailboat. Absolute Boat used a 2009 28' ZODIAC as the tug for Zidal's sailboat. At the time of the incident, Absolute Boat was leasing the tug from Jersey Shore under a bareboat charter. Tharp owns both Absolute Boat and Jersey Shore.

Based on a recommendation from the Florida Fish and Wildlife Conservation Commission, Zidal decided to have the sailboat towed to a marina just north of the Pineda Causeway. The route of the towage required the Zodiac Tug and the sailboat to travel underneath the Pineda Causeway Bridge on the Banana River.

Tharp sent Captain Charles Nunn to tow the sailboat. Before setting sail, Nunn did not verify the height of the sailboat's mast. During his deposition, Nunn stated the industry rule of thumb for determining a sailboat's mast height is to multiply its length by one and a half. When asked what that calculation method told him about the approximate mast height of Zidal's sailboat, Nunn answered, "I think that—if it's a 27-foot boat, the number would work out to 48 feet, 6 inches, so—it's well inside of the 43 feet of the clearance of the Pineda Causeway." Nunn testified

there was no policy or procedure at Absolute Boat that required him to know the height of a sailboat mast before a tow.

Nunn testified that he did not ask Zidal the height of the mast, but Nunn did ask Zidal how his boat got to its location, and Zidal said it came from the north. Nunn took that to mean that the boat passed under the Pineda Causeway as he assumed it had to go that way if it came from the north. At the time the tow occurred, Nunn knew the clearance height of the Pineda Causeway was 43 feet.

The tow commenced on November 18, 2020, with Nunn as the sole crewmember aboard the tug, and Zidal the sole crewmember aboard the sailboat. Zidal did not advise Nunn that he was inexperienced or ask why he was required to be on the sailboat during the tow. As the tug and tow sailed beneath the Pineda Causeway, the mast of the sailboat allided against the northern span of the bridge. The allision caused the boom of the sailboat to swing and strike Zidal on the head.

Appellants initiated this action by filing a complaint and petition for exoneration from or limitation of liability pursuant to 46 U.S.C. § 30501, *et seq.* (Limitation Act). Zidal answered Appellants' complaint and filed a counterclaim for his personal injuries. Appellants sought summary judgment on the issue of their liability for the incident, and Zidal also moved for summary judgment, arguing that Appellants could not succeed under the Limitation Act as a matter of law.

The district court denied Appellants' summary judgment motion and granted Zidal's summary judgment motion in part. The district court determined that Appellants were not free from contributory fault for the accident and denied exoneration as a matter of law. The district court also determined that the tug was the dominant mind of the flotilla, and the tug was at fault for failing to appreciate the risk of allision. Finally, the district court found that Appellants could not demonstrate that Nunn's negligence occurred outside of Tharp's privity or knowledge. The district court concluded that Appellants were not entitled to limit their liability as a matter of law.

## II.  DISCUSSION

Appellants contend the district court erred in not exonerating them from all liability and determining they were not free from contributory fault. Appellants also contend the district court erred in denying entitlement to exoneration based on its application of the dominant mind doctrine and the *Pennsylvania* Rule. They assert the district court erred in concluding Tharp had privity or knowledge of Nunn's alleged negligence and the sailboat's unseaworthiness. We address each issue in turn.

Pursuant to the Limitation Act, a vessel owner's liability shall not exceed the value of the vessel and pending freight for claims arising from any loss, damage, or injury by collision, without the privity or knowledge of the owner. 46 U.S.C. § 30523(a)-(b) (formerly 46 U.S.C. § 183(a)). "Under this statute, [the vessel owner] is liable beyond the value of the ship if it had privity and

knowledge before the start of the voyage of the acts of negligence or conditions of unseaworthiness that caused the accident." *Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1563 (11th Cir. 1985). "A shipowner is entitled to exoneration from all liability for a maritime collision only when it demonstrates that it is free from any contributory fault." *Am. Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996). We use a two-step analysis to determine whether a shipowner is entitled to limitation of liability. "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." *Hercules Carriers*, 768 F.2d at 1563-64 (quotation marks omitted). "[O]nce a claimant satisfies the initial burden of proving negligence or unseaworthiness, the burden of proof shifts to the shipowner to prove the lack of privity or knowledge." *Id.* at 1564.

A. *Negligence*

Zidal first has the burden of showing Appellants' negligence. As to tugs and tows, the Supreme Court has explained:

> The tug does not have exclusive control over the tow, but only so far as is necessary to enable the tug and those in charge of her to fulfill the engagement. They do not have control such as belongs to common carriers and other bailees. They have no authority over the master or hands of the towed vessel beyond such as is required to govern the movement of the flotilla. In all other respects and for all other purposes the

> vessel in tow, its cargo and crew, remain under the
> authority of its master; and, in emergency, the duty is
> upon him to determine what shall be done for the
> safety of his vessel and her cargo. In all such cases the
> right of decision belongs to the master of the tow and
> not to the master of the tug. A contract merely for
> towage does not require or contemplate such a deliv-
> ery as is ordinarily deemed essential to bailment.

*Stevens v. The White City*, 285 U.S. 195, 200 (1932). "In a contract of towage, the owner of the tow is responsible for the seaworthiness of his vessel and the owner of the tug for its safe navigation." *Nat G. Harrison Overseas Corp. v. Am. Tug Titan*, 516 F.2d 89, 94 (5th Cir. 1975)[4] (quotation marks omitted). A tug owes a tow "the duty to exercise such reasonable care and maritime skill as prudent naviga-tors employ for the performance of similar service." *Stevens*, 285 U.S. at 202.

Appellants contend the mast height of the sailboat was an unseaworthy condition, and therefore Zidal was responsible for the allision. Zidal was aware the sailboat was being towed north of the Pineda Causeway, was aboard the sailboat during the voyage and could see it was being towed beneath the Pineda Causeway, and had the opportunity to advise Nunn that his sailboat was un-seaworthy due to its mast height, but failed to do so. "In failing to furnish a seaworthy tow, [Zidal] directly contributed to his own

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Cir-cuit handed down prior to close of business on September 30, 1981.

injury." The district court further determined Zidal was negligent for agreeing to take the helm because of his inexperience. We agree with the district court's determination that Zidal was negligent.

The district court did not determine Zidal alone was negligent, however. It stated the mast height constituted unseaworthiness "so apparent that it was negligent for the Tug to attempt to proceed beneath the Pineda Causeway." Appellants contend the district court made a clearly erroneous factual finding that Nunn visually inspected the sailboat and approximated that it was about 48 feet, 6 inches tall. We agree that Nunn did not testify he made this calculation while visually inspecting the sailboat. Instead, Nunn testified the industry rule of thumb for determining a sailboat's mast height is to multiply its length by one and a half. When asked what that calculation told Nunn about the approximate height of the sailboat's mast, Nunn answered, "I think that—if it's a 27-foot boat, the number would work out to 48 feet, 6 inches, so—it's well inside of the 43 feet of the clearance of the Pineda Causeway." As the district court stated, Nunn's calculation was "fuzzy math," but Nunn's statement does not support that he made the calculation while visually inspecting the sailboat.

However, other evidence supports the district court's negligence determination. At the time of the tow, Nunn knew the clearance height of the Pineda Causeway was 43 feet. The sailboat manufacturer's specifications state the mast height was 43.50 feet. Nunn was negligent in failing to verify the sailboat's mast height

before undertaking the voyage despite knowing the clearance height of the Pineda Causeway was 43 feet. Nunn was able to visualize the height of the sailboat's mast, which should have put him on notice that the height could be close to the clearance of 43 feet. While Nunn may not have estimated the mast height to be "48 feet, 6 inches" at the time of the tow, he also did not inquire about the height, and if he verified the height before setting out, he would not have attempted to tow the sailboat underneath the Pineda Causeway. *See Stevens*, 285 U.S. at 202 (stating a tug owes a tow "the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service"). Further, if Nunn performed the industry rule of thumb calculation correctly, he would have recognized the need to precisely measure the mast height to ensure the sailboat would fit under the 43-foot clearance height. Zidal's sailboat was 30-feet long,[5] not 27. Using Nunn's industry rule of thumb, 30 feet times 1.5 equals 45 feet—2 feet above the Pineda Causeway's vertical clearance of 43 feet.

While Nunn testified that he assumed the sailboat had passed under the Pineda Causeway based on Zidal's statement that the sailboat "came from the north," that is not the same as Zidal telling Nunn the sailboat had passed under the Pineda Causeway. The district court did not err in concluding Nunn was negligent in

---

[5] Zidal's sailboat specifications show that the LOA, or length overall, was 29.92 feet. We round to 30 feet for purposes of the calculation, but even using the exact length shows the sailboat's mast was too tall to fit under the Pineda Causeway—29.92 times 1.5 equals 44.88 feet.

failing to verify the height of the sailboat's mast as the unseaworthiness of the sailboat to pass under the bridge was apparent.

B. *Dominant Mind Doctrine*

Appellants assert the district court erred in concluding the dominant mind doctrine applied. "The dominant mind doctrine usually kicks in where a flotilla—*i.e.* the tugs and tows as unit—causes damage to some third party." *Cont'l Ins. Co. v. L&L Marine Transp., Inc.*, 882 F.3d 566, 572 (5th Cir. 2018). "[T]he dominant mind doctrine can sometimes be used where a tow itself is damaged—in such situations, a tug that was the dominant mind may have had the duty of safely navigating the tow and may be liable." *Id.* at 572-73 (citing *Com. Union Ins. Co. v. M/V Bill Andrews*, 624 F.2d 643, 647 (5th Cir. 1980); *Chitty v. M/V Valley Voyager*, 408 F.2d 1354, 1356-57 (5th Cir. 1969)).

> As explained by the Eastern District of Louisiana,
>
> A tug must make a reasonable inspection of her tow before undertaking a voyage. The tug master, moreover, must obtain knowledge from personal cognizance, or avail himself of the means of knowledge, of conditions likely to produce or contribute to a loss, unless appropriate means are adapted to prevent it. Captains are held to a standard of prudent navigation, including the knowledge they should have had.

*Ryan Walsh Stevedoring Co. v. James Marine Serv., Inc.*, 557 F. Supp. 457, 461 (E.D. La. 1983) (quotation marks, alterations, and citations omitted).

The district court did not err in concluding the dominant mind doctrine applied.  Appellants argue that Zidal was the dominant mind of the flotilla as he had as much control over the towage of his sailboat as Nunn, given that Zidal selected the location to which Nunn would tow his sailboat and controlled its helm during the towage.  However, Nunn, as tug master, should have obtained knowledge or availed himself of the means of knowledge of the condition likely to produce the allision, that is, the sailboat's mast height.  *See id.*  Appellants did not offer sufficient proof to overcome the presumption that a tug which tows her tow into an allision with a stationary object is presumptively at fault.  *See Plains Pipeline, L.P. v. Great Lakes Dredge & Dock Co.*, 54 F. Supp. 3d 586, 589 (E.D. La. 2014).

Appellants also argue the dominant mind doctrine is inapplicable because Zidal was not a third party to the flotilla.  This argument is meritless.  *Continental Insurance* provides, "the dominant mind doctrine can sometimes be used where a tow itself is damaged—in such situations, a tug that was the dominant mind may have had the duty of safely navigating the tow and may be liable."  *Cont'l Ins.*, 882 F.3d at 572-73 (citing *Com. Union Ins. Co.*, 624 F.2d at 647; *Chitty*, 408 F.2d at 1356-57).

## C.  Pennsylvania *Rule*

Appellants also contend the district court erred in applying the *Pennsylvania* Rule and concluding Nunn violated International Regulations for Preventing Collisions at Sea (COLREGS) Rule 7.  The *Pennsylvania* Rule provides "when . . . a ship at the time of a[n

allision] is in actual violation of a statutory rule intended to prevent [allisions], it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster." *The Pennsylvania*, 86 U.S. 125, 136 (1873). "In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *Id.* "The *Pennsylvania* Rule is not a rule of liability, but shifts the burden of proof as to causation. This burden is strict, but it is not insurmountable." *Superior Constr. Co. v. Brock*, 445 F.3d 1334, 1340 (11th Cir. 2006) (quotation marks omitted).

As an initial matter, Appellants are correct that the Banana River is subject to the Inland Navigation Rules rather than the COLREGS because, even though the Banana River is connected to the high seas by way of Port Canaveral, it is "shoreward of the navigational demarcation lines dividing the high seas from harbors, rivers, and other inland waters of the United States." 33 U.S.C. §§ 1603(1) (COLREGS), 1604(a) (Inland); 46 C.F.R. § 7.95(d). However, Appellants concede that Rule 7 of the Inland Navigation Rules requires that "[a]ssumptions shall not be made on the basis of scanty information." 33 C.F.R. § 83.07(c). Rule 7 states that "[e]very vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist." *Id.* § 83.07(a).

The district court did not err in determining the *Pennsylvania* Rule applied. Nunn made assumptions based on scanty information and did not independently verify the height of the sailboat even though he knew or reasonably should have known that it posed a risk of allision. Nunn was never informed that the sailboat could travel beneath the Pineda Causeway and assumed it could based solely on Zidal's comment that the sailboat came from the north. This constitutes an assumption based on scanty information.

Nunn's Rule 7 violation triggers the *Pennsylvania* Rule. As Appellants cannot show the allision "could not have been" the tug's fault, the *Pennsylvania* Rule applies. *The Pennsylvania*, 86 U.S. at 136.

### D. Privity or Knowledge

At step two of the Limitation Act analysis, evidence of lack of actual knowledge is insufficient to establish a lack of privity or knowledge, "for privity and knowledge is established where the means of obtaining knowledge exist, or where reasonable inspection would have led to the requisite knowledge." *Am. Dredging*, 81 F.3d at 130. "Thus, knowledge is not only what the shipowner knows but what he is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss." *Hercules Carriers*, 768 F.2d at 1564.

As to owner Tharp's privity or knowledge, Appellants contend the district court erred in determining that Tharp personally approved the towing agreement, and that agreement included a description of the make and model of the sailboat. Appellants are

correct that the towing agreement does not include the model of sailboat, only the make. However, we agree with the district court that "[t]here is no genuine dispute that Tharp could have discovered that [Zidal's] sailboat was unseaworthy with a reasonable inspection or inquiry." Tharp was familiar with the vertical clearance height of the Pineda Causeway and knew the sailboat was going to be towed underneath the Pineda Causeway northbound on the Banana River. Despite this, Tharp did not require Nunn to ascertain the height of the mast before commencing the tow. For these reasons, the district court did not err in concluding Tharp had knowledge or privity of Nunn's apparent negligence.

## III. CONCLUSION

The Appellants are not free from contributory fault in towing Zidal's sailboat beneath the Pineda Causeway. A reasonable inspection of the height of the mast would have apprised Appellants of conditions likely to produce or contribute to a loss. Thus, we conclude the district court did not err in denying exoneration as a matter of law. We affirm the district court's denial of Appellants' motion for summary judgment and its grant, in part, of Zidal's motion for summary judgment.[6]

---

[6] We also affirm the district court's denial of Appellants' motion for reconsideration. As to that order, Appellants contend Jersey Shore should be dismissed from this action as it was not involved in the tow. The district court rejected this argument, stating the Appellants raised it only in passing and did not provide any meaningful evidentiary or legal support. However, the district court stated that Appellants were free to argue the issue at trial. The district court did not abuse its discretion in this determination. *Drago v. Jenne*, 453 F.3d 1301,

16                    Opinion of the Court                    24-13009

**AFFIRMED.**

---

1305 (11th Cir. 2006) (stating we review the district court's denial of a Fed. R. Civ. P. 59 motion for reconsideration for an abuse of discretion).